**NICOLE E. LAMBROS [SBN: 215524]**
Attorney at Law
620 Jefferson Street
Redwood City, CA 94063
Cell: (415) 596-4647
nlambros@lambroslegal.com
Attorney for Ramiro Velasco

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>vs.<br><br>RAMIRO VELASCO, JR.<br><br>                   Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | DOCKET NO.:  CR 21-342-YGR<br><br>DEFENDANT'S SENTENCING<br>MEMORANDUM AND REQUEST<br>FOR A DOWNWARD VARIANCE.<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date:   May 11, 2023<br>Time:  10:30 a.m. |

## I.    INTRODUCTION

Ramiro Velasco pled guilty and accepted responsibility for aiding and abetting the distribution of 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii), and 18 U.S.C. § 2.

The parties did not reach an agreement as to Mr. Velasco's Criminal History Category. The plea form reflects that the adjusted offense level calculation would be 31, without a reduction of the two-point variance provided for in USSG § 5C1.2(a). (Plea Agreement, pg. 5-6.)

The final Presentence Investigation Report (PSR) was filed on April 27, 2023. The report calculated the Sentencing Guideline based on a total offense level of 31 and a criminal history

category VI, concluding that the guideline imprisonment range is 188 to 235 months. (PSR [Dkt. 61] pg. 6-7.) If the Safety Valve provisions apply, the total offense level would be 29, resulting in an imprisonment range of 151 to 188 months. (PSR [Dkt. 61] Pg. 18.) The government recommends a sentence of 96 months. (Plea Agreement pg. 7.)

Mr. Velasco respectfully requests that this court impose a sentence of not more than sixty (60) months, which is sufficient but not greater than necessary to meet the objectives of sentencing under 18 U.SC. § 3553(a)(2). Specifically, Mr. Velasco asks the Court to consider the nonviolent nature of his criminal history, which was the result of drug and alcohol addiction; his mitigated role in the current offense, and his demonstrated commitment to achieving sobriety. (See Exhibit A: Ramiro Velasco's Letter to the Court.)

Mr. Velasco is a full-time worker in the Intake and Classification Unit at the Santa Rita jail for ten months. (Exhibit B: Interview with Deputy Soto.) His continuous exposure to people suffering from addiction has provided a strong incentive to strive toward rehabilitation, which is attainable with the financial and emotional support of his family.

## II.   GUIDELINE CALCULATION AND JUDICIAL DISCRETION

### A.   This Court has Discretion to Impose a Reasonable Sentence Below the Calculated Guideline Range.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the district courts have discretion to depart from the guideline range. When assessing a sentence, a district court judge must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Courts should also reject advisory guidelines that are not based on national sentencing data and empirical research or fail to provide an appropriate sentence for the individual defendant. *See Spears v. United States*, 555 U.S. 261, 265–66 (2009).

The sentencing court also has the discretion to weigh mitigating factors that were previously deemed "not ordinarily relevant, such as age, education and vocational skills, mental and emotional

conditions, employment record, and family ties and responsibilities." *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005). The factors available for the court's consideration also include personal characteristics such as drug and alcohol dependence, lack of guidance as a youth, and economic pressures. *Id.;* citing *Koon v. United States*, 518 U.S. 81, 98 (1996).

"Extraordinary" circumstances are not required to justify a sentence outside the guideline range. *Gall v. United States*, 552 U.S. 38, 47 (2007). Rather, the courts must calculate and consider the guideline range as a starting point, but may sentence outside the range if a sentence is reasonable considering the factors set forth under 18 U.S.C. § 3553(a). *Gall, supra,* 552 U.S. at 49. Every convicted person is an individual and every case is "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52.

## III.   RELEVANT FACTUAL BACKGROUND

### a.   The Facts of the Current Offense are Mitigated

Mr. Velasco was identified and arrested as part of a broader FBI investigation involving the sale of distribution of methamphetamine in Northern California. (PSR pg. 5.) Mr. Velasco and the government informant, referred to as "Person-1," were close personal friends in 2020. Person-1 approached Mr. Velasco at a gathering on October 15, 2020 and inquired about a connection for the purchase of methamphetamine. Mr. Velasco informed Person-1 that he had a contact and provided an estimated price.

Person-1 contacted Mr. Velasco on October 19th and again on October 26, 2020 to follow up on his request to purchase methamphetamine. Mr. Velasco stated that he had spoken to his contact and quoted an estimated price of $3200.00 for a pound of methamphetamine. Person-1 continued to initiate contact with Mr. Velasco by calling and texting on October 27, 28 and 29, 2020. On October 30th, Mr. Velasco provided Co-Defendant Derek Williams' phone number. Mr. Velasco was at his

home in Visalia, but advised Person-1 to contact Williams to discuss the specifics of the meeting location and the product.

Person-1 and Derek Williams arranged to meet on October 30, 2020 to facilitate the transaction. Mr. Velasco was not present at the October 30, 2020 meeting and he had no further involvement in the subsequent transactions.

## IV.   MR. VELASCO'S CRIMINAL HISTORY IS OVERSTATED.

Mr. Velasco's criminal history points are directly attributed to his lifelong drug and alcohol abuse. The PSR calculates ten (combined) criminal history points for offenses that involved the possession of a controlled substance. The calculation also includes two points for driving under the influence and three points for convictions of driving on a suspended license (following a DUI conviction). (Cal. Pen. Code §14601.2.)

Mr. Velasco was an 18-year-old high school senior when he was first sentenced to state prison for possession of methamphetamine in 2008. At age 20, he pled guilty to possession of a firearm with a gang enhancement and returned to prison in 2010.

After completing his second prison term, Mr. Velasco was convicted of driving under the influence while in possession of a controlled substance and sentenced to a year in jail in 2012. The stop was initiated because Mr. Velasco had an expired registration tag. He submitted to a breath test and registered a .09% BAC. During the contact, Mr. Velasco admitted to officers that he was in possession of methamphetamine because he had a drug addiction. (PSR, pg. 10.) Two years later, Mr. Velasco was contacted by officers at a nightclub and attempted to ingest 4 grams of cocaine.

The probation officer provided a total criminal history point calculation of 19. (PSR, pg. 13.) Mr. Velasco accepts the criminal history calculation, but submits that the score is overstated considering that his prior offenses are nearly all related to drug use and addiction. The calculation also includes two points because Mr. Velasco was on probation at the time of the current offense.

(USSG § 4A1.1(d).) Specifically, he was on informal probation for a misdemeanor violation of driving on a suspended license.

Mr. Velasco's criminal history does not include any crimes of violence and he has been consistently described as a respectful, nonviolent person. (Exhibits B-D; PSR [Dkt 61] pg. 17.)

## V.  MR. VELASCO'S BACKGROUND IS DEFINED BY DRUG AND ALCOHOL ADDICTION.

Mr. Velasco was raised in San Jose, California and moved with his family to Visalia in his freshman year of high school. (PSR [Dkt. 61] pg. 16.) He grew up in a safe and supportive family environment; however, he had difficulty adjusting to life in Visalia and began using controlled substances at a young age. (Exhibit A, PSR, pg. 18-19.) He was exposed to gang violence as a teenager and turned to alcohol and cocaine to cope with social conflict. (Exhibit A; Exhibit C: Interview with Sara Velasco; PSR, pg. 17-18.) Mr. Velasco's family home was also the target of multiple drive by shootings that resulted in property damage and exacerbated his reliance on controlled substances. (Exhibit C.)

Mr. Velasco admitted that he began drinking alcohol and using controlled substances when he was fourteen years old. (PSR [Dkt. 61] pg. 16.) His criminal history illustrates his lifelong addiction, which resulted in multiple periods of incarceration for drug possession and alcohol abuse.

Mr. Velasco's substance abuse has detrimentally impacted his own life and those closest to him. His wife, Angela, sought a divorce after his recent arrest. Further, his current period of pre-trial incarceration has required his parents to become the primary caregivers for his son, Joshua.

Joshua has been in therapy following a recent suicide attempt and he had difficulty expressing himself in a letter to the Court. (See Exhibit C, pg. 5.) However, Joshua requested an interview with counsel and Mr. Velasco's investigator. (Exhibit D: Interview with Joshua Velasco.) Joshua explained that his father's absence has been difficult, but emphasized that Mr. Velasco is a caring man who has consistently supported Joshua emotionally. Remarkably, Joshua is awaiting Mr. Velasco's release and hopes to help support Mr. Velasco through his reentry. (Exhibit D, pg 4.)

## VI.  MR. VELASCO PRESENTS A LOW RISK OF REOFFENDING AND A LONGER PERIOD OF CONFINEMENT WILL SERVE NO OTHER RECOGNIZED OBJECTIVE.

Mr. Velasco is now thirty-three (33) years old. His young adult life was dominated by periods of imprisonment due to addiction and he has been in pretrial detention since April of 2022.

As a result of the Covid-19 pandemic, custodial programs have been severely limited. However, Mr. Velasco has actively sought out meetings and resources for addiction. He began working in the Intake and Classification Unit at the Sant Rita jail in August of 2022. Alameda Sherriff's Deputy Soto confirmed that Mr. Velasco is a trusted worker who takes his position in the Intake Unit seriously. (Exhibit B: Int. with Deputy Soto.) Deputy Soto reported that Ramiro maintained a good relationship with the staff and the deputies who work in the Intake and Classification Unit. (Exhibit B.)

Mr. Velasco has witnessed the effects of long-term substance abuse while working in the Intake Unit. As an inmate worker, he has had to assist people suffering from withdrawals, clean up after those who are physically ill from drug use and watched as guards confiscate secreted narcotics from desperate addicts. Mr. Velasco also witnessed an individual overdose in custody. (Exhibit A, Ramiro Velasco's Letter to the Court.) These experiences have forced Mr. Velasco to confront his own addiction and to acknowledge the damage he has done to his family and to himself.

Mr. Velasco views his position as an inmate worker as an invaluable learning opportunity. He reflected on his experience and found it "mentally disturbing" to see the long-term effect of addiction. (Exhibit A, pg. 2.)  His continued employment in this unit demonstrates a determination to continue with recovery and self-improvement.

Considering his non-violent criminal history and his evident substance abuse, Mr. Velasco would be an appropriate candidate for CAP (if released from custody). However, the government did not agree to sentencing alternatives.

Sara and Ramiro Velasco Sr. continue to support Mr. Velasco and they are both optimistic that he will move forward in a positive direction following his sentence in the current case. (Exhibit C; PSR, pg. 17.) Joshua is frustrated with his father's behavior, but he emphasized that he supports him fully and that he intends to assist Mr. Velasco with his recovery. (Exhibit D.) Mr. Velasco also recognizes that he has no choice but to work toward sobriety and self-improvement.

A sentence of five years is more than adequate to address the mitigated conduct underlying this offense, while also offering Mr. Velasco a chance to participate in more intensive programs and continue in his recovery. A lengthy prison term will not protect the community or provide additional deterrence from future criminal conduct.

## VII.   CONCLUSION

Fortunately, Mr. Velasco has strong family support and he will return to a structured home environment when he is released from custody. His parents and his son are willing to assist him through recovery. Mr. Velasco also has an employment opportunity through his father's HVAC business.

Mr. Velasco's involvement in the current offense was minimal. Though he facilitated the connection between the informant and Mr. Williams, he was not in possession of the methamphetamine and he had no control of the quantity or purity of the product that Williams ultimately sold to the informant. Mr. Velasco was not involved in further activity after the initial connection he facilitated.

/ / /

The mandatory minimum sentence of five years will be considerably longer than any of Mr. Velasco's prior commitments. A 60-month term will be sufficient to protect the public while providing deterrence of future criminal conduct. Further, Mr. Velasco hopes to participate in the RDAP program once his sentence commences. His commitment to his role in the Intake Unit demonstrates that he will be a successful candidate for RDAP and for future rehabilitation.

Dated: May 4, 2023

Respectfully submitted,

Nicole E. Lambros
Attorney for Ramiro Velasco

# EXHIBIT A

1

Dear Honorable Judge,

Your Honor, I Want To Take The Time To Thank You In Advance For Your Time & Attention. I Also Want You To Know That I Fully Take Responsibility For My Actions & I Have Begun My Journey To Really Look At Myself Honestly, To Asses How I Got Here, To Determine The Changes That I Know Are Needed & To Rebuild Who I Am. ~~I Have A~~ I Also Would Like To Take This Time To Your Honor, To The Officers Of The Court & To My Family For The Year Of Stress, Jail Phone Calls, Visits, & All Else That Involves With That Of My Incarceration. I Am Very Disappointed In Myself & I Feel Like An Embarrasment Not Only To Myself, But To My Family, My Community & All Those Who Know Me. I've Battled With Addiction For A Very Long Time But Failed To Recognize That I Truly Was One. Nobody Wants To Ever Admitt Such As I Did So. Of Course For The Most Part Of The Time, I Did Not Believe I Was An Addict. As I Learned More About The Disease, & Seeing First Hand While Being In Santa Rita Facility Where I've Been Given The Oppurtunity To Work As A Worker In Intake & See Where Addiction Can Lead, I've Seen Many People Come In & I've Never Been Around To See How Addiction Has Consumed Many Lives, Even Seeing Overdoses Something That Has Been A Mentally Disturbing Thing To See. I've Witnessed This Epedemic First Hand & See All The People Effected By It. Thus, Me Coming To Realization

2

That I Have Been A Addict For A Very Long Time. A Majority Of Crimes I Ever Committed I Was Either High Off Drugs Or Trying To Get More Drugs I Let The Addiction Take Over My Life & Dictate Many Of My Decisions. As Difficult As The Past Year Has Been, It Has Allowed Me To Beat The Addiction. I Have A Very Solid Base Of Support. My Mother Sara Velasco, My Father Ramiro Velasco Sr., My Sister Jessica Yancy, My Son Joshua Velasco Along With My Girlfriend Andrea Jimenez Who Are All By My Side & There To Support Me In My Future. My Son Is 16 yrs Old & I Plan To Re Establish My Relationship As A Father To With Him. He Is At A Tender Age Where Having His Father Present Is Very Important & Critical. Your Honor, I Have Great Parents & I Should Have Done Alot Better Than This. I Can Not Fault Them In Any Way Shape Or Form, As They Gave Me Anything A Child Could Want. My House Hold Consisted Of Positive Role Models, None Of Whom Indulged In Using Drugs. Through This Time Period Of Being Incarcerated, I Have Been Able To Elevate My Mind & Open Up To What Is More Important. I Realized That At My Age, I Can Have A Good Life Ahead Still. I Have Regrets & The Biggest One Is Not That I Got Caught, It's The Selfish Way I Lived My Life & The Innocent People Whom Also Been Effected & Hurt Along The Way.

3

My Family Is Waiting To Support Me Emotionally, Spiritually, & Financially Through This Hard Time. I Stand Here Guilty Of My Crime, But I Know My Life Is Worth More Than Being In Prison. Your Honor, I Will Succeed, I Will Not Be Involved Again In Any Crime & Will Be Putting The Pieces Of My Life Back Together. Thank You For Kindly For Your Valuable Time & Attention.

# EXHIBIT B

## Daniel DeSantis & Associates

Investigative & Legal Services
California License PI22551

Post Office Box 53469
San Jose, California 95153
(408) 226-4442 – ddesantis4442@aol.com

Client:  Ramiro Velasco, Jr.

Interview of Deputy Soto, #2301, Alameda County Sheriff's Office

Friday, January 20, 2023

On the above date I had a telephone conversation with Deputy Soto, #2301, one of two deputies who supervise Ramiro in the Alameda County - Santa Rita Jail Classification and Booking section of the jail.

Deputy Soto said Ramiro is a "cleared pod worker in good standing" in the Intake and Classification Unit and has been such since August 27, 2022.  Deputy Soto said Ramiro also works under Deputy Vargas (badge number not given).  He said Ramiro meets the qualifications to work in this capacity based on his charges and custodial history.  Soto has never heard of any negative aspect of Ramiro's job performance, and if any had been raised "he would have been fired immediately."

Deputy Soto said Ramiro's job duties place him in near contact with incoming and outgoing inmates who are being screened and classified for nursing, mental health and other issues upon arrival at the jail.  Ramiro is responsible for cleaning the common areas, hallways and intake cells during the processing of new or outgoing inmates.

US vs. Ramiro Velasco, Jr.
Interview of Deputy Soto, #2301, ACSO
January 20, 2023
Page 2

Deputy Soto said it is department policy that a deputy is not allowed to speak as a character witness for any inmate.  Deputy Soto said it was his observation and belief that Ramiro has maintained a good relationship with all of the Intake/Booking and Classification Unit deputies and staff throughout his service there.

Respectfully,

Daniel DeSantis

# EXHIBIT C

# Daniel DeSantis & Associates
## Investigative & Legal Services
### California License PI22551

Post Office Box 53469
San Jose, California 95153
(408) 226-4442 – ddesantis4442@aol.com

Client:  Ramiro Velasco, Jr.

Interview of Sara Velasco & Ramiro Velasco, Sr.

<u>May 22, 2022</u>

On the above date I interview Sara H. Velasco (dob 6/12/1972) and Ramiro L. Velasco, Sr. (dob 6/6/69) at their home at ███████e Street, San Jose, CA 95111.  They are the parents of Ramiro, Jr. (dob 9/18/1989) and his younger sister, Jessica Yancy (born 1/28/1996).   Both were very cooperative in discussing their son.

Sara was born in San Jose, but at age 9 moved to Mexico with her parents for three years before returning to San Jose. Ramiro, Sr. was born in Mexico and came to the U.S. with his family when he was 13 years old.  They met while they both attended Yerba Buena High School in San Jose.  The couple married and lived in various residences in east San Jose until Ramiro finished middle school.  At that time he was a good, well behaved child, loved soccer and played trombone (and other instruments if needed) in marching bands.

Ramiro, Jr. (hereafter "Ramiro") went to local public schools in San Jose.  He enthusiastically played soccer (often coached by his father) on travelling teams from ages 5 through 13. He was on his school wrestling teams in 7th and 8th grade.  These parents were active in Ramiro's schooling and took his

US vs. Ramiro Velasco, Jr.
Int. Sara & Ramiro Velasco, Sr.
5/22/2022
Page 2

homework and grades very seriously. They noticed a dip in his scholastic grades in 8th grade and required

him to take summer school classes that year for the first time. In fact, Ramiro's grades had gotten so low

that t he said he had to "re-take the 8th grade."

However, the summer after Ramiro's 8th grade year in San Jose they decided to move from San

Jose to Visalia because the cost of living in San Jose was so high and they could both retain good paying

jobs and purchase a home in Visalia. The decision to move greatly disappointed Ramiro, who had made

close friends in San Jose. They said at first Ramiro stubbornly said: "I'm not moving" and then shortly

after moving to Visalia he "ran away two times." On both occasions he hitchhiked back to San Jose and

stayed with his grandparents. Each time Sara and Ramiro, Sr. drove to pick him up and take him back to

Visalia.

So concerned were they about Ramiro that they asked him to speak with a "counselor" in Visalia.

The counselor told them "Ramiro would not open up." The parents said they never felt Ramiro used drugs

or drank alcohol prior to them moving to Visalia. While in Visalia, Ramiro lapsed into an angry, sullen

teenager and found friends who smoked marijuana and drank alcohol. He got caught with marijuana and

wasn't allowed to have a California driver license. Things were not going well for Ramiro in Visalia, while

Jessica was an ideal daughter and student and seemed to thrive in their new environment. Sara and

Ramiro, Sr. said it is possible that Jessica's success in Visalia may have only enhanced Ramiro's feelings of

loneliness and failure in the new city.

The family lived in a brand new 4 bedroom, 2 ½ bath, 2200 square foot home in Visalia. Ramiro

had his own room and a family dog that he loved. However, in school he said he "got picked on" and

bullied because other students knew he was "from the Bay Area." Ramiro never complained much about

the treatment he received, but the parents learned about it from teachers and others and knew it was a

US vs. Ramiro Velasco, Jr.
Int. Sara & Ramiro Velasco, Sr.
5/22/2022
Page 3

real problem for their boy. Ramiro finally completed the 8th grade in Visalia.  However, he declined to become involved in any school or after school activities, like sports or marching band.  He got "barely passing" grades in Visalia, but was moved on to the 9th grade.

In the 9th grade Ramiro started smoking marijuana and got expelled from his school.  He went to a charter school but continued to act up and was arrested (as a juvenile).  He never directly disrespected or fought with his parents, but was definitely an unhappy and unpleasant teenager.  When he was 16 he met "Cindy" (Cedillo), and they became intimate.  Cindy became pregnant (at 15) and Ramiro was only 17 when the child (Joshua) was born.  Sara and Ramiro, Sr., learning that Cindy's homelife was terrible, immediately took her into their home so she would have a healthy and comfortable place to live while she was pregnant with their grandchild.  During the pregnancy Cindy had "gall bladder stones" and Sara "became like her mom" and took care of her.  Cindy eventually gave birth through C-section surgery.

Ramiro was now 17-18 years of age, not working and had no means of transportation.  He doted over Cindy and the baby, but had no purpose in his life.  Sara and Ramiro, Sr. gave him a car so he could look for work and take Cindy to medical appointments.  Sara thinks that is when Ramiro "started getting high" (marijuana).  He would "disappear" for a day or two to "hang out with his friends."  It was at this time when the parents noticed "a huge difference in his personality and character."  Ramiro seemed to become friendly with much harder, tougher friends.  He got arrested for DUI and then went to prison for a year or two.  Cindy and Joshua remained in the Velasco home.  Due to a downturn in the economy, both Sara and Ramiro, Sr. lost a great deal of their income and their home went into foreclosure.  They had to move in with Sara's mother in Visalia.  Around that time Cindy too would disappear for three or four days at a time, obviously getting high or drunk with friends or new friends.  Cindy and Ramiro's relationship was clearly over.  Sara said she kept Joshua in her home and raised him as she had done her own children.

US vs. Ramiro Velasco, Jr.
Int. Sara & Ramiro Velasco, Sr.
5/22/2022
Page 4

Sara said she would bring Joshua to be with Cindy at least one day a week, but Joshua began reporting to them that Cindy was the victim of beatings and domestic violence "from her new boyfriend." Sara took Joshua back (with no resistance from absent mother Cindy) from his first grade school year through his 7th grade year.

Neither before or after his long incarceration did Ramiro ever display any gang colors, insignia, indicia or writings. He never talked about gangs or being in a gang. He got some tattoos but not many. They recalled a "408) and a "XIV" on his hand. Ramiro, Sr. had a "weed card" and a "grow card" for a small amount of legal marijuana. When the police task force raided the home Ramiro and his father were both arrested. The police also found a gun in the house. Ramiro, Sr. said the gun belonged to him.

The parents said there were "drive by" shootings at or near their home in Visalia three times. They attributed those incidents to bad people that Ramiro hung out with. However, they were told by investigating police officers that the drive by shootings were in retaliation for fights Ramiro had with a teenager in high school. The family left Visalia in 2017.

When Sara and Ramiro, Sr. relocated back to San Jose (for better paying jobs) in 2017, Ramiro stayed in Visalia, as he met a woman named Angela Martinez. Angela had three children from a previous relationship, but Ramiro bonded with the children and wanted Joshua to have siblings. They all lived together in Visalia. Jessica moved to Texas in 2017 as well. She first joined the US Army, then got a college degree and nursing credentials. She married, has a good husband and two children (3 & 1 at the time of this writing). She is employed as a Registered Nurse in the El Paso, TX area.

Ramiro was arrested in the Visalia are while driving with Angela. He was taken into custody on March 18, 2022 and had been in jail since that day. When he is released both Sara and Ramiro, Sr. said Ramiro can live with them and his son in San Jose. There is plenty of room in their new home and Joshua,

US vs. Ramiro Velasco, Jr.
Int. Sara & Ramiro Velasco, Sr.
5/22/2022
Page 5

through all the difficulties in his life, loves his father very much.  Joshua had been living with his mother,

Cindy Cedillo, and her family in Visalia, and things had become very bad for him there.  In 2020 Ramiro

and Angela were married in Reno, NV.  The plan was to have Joshua graduate from high school and then

go to El Paso, Texas to live with Jessica and her family.  However, things did not go well in Ramiro's

relationship with Angela and his current incarceration had virtually ended their marriage.  Both parents

knew Ramiro "smoked marijuana", probably daily, but they did not feel he was an "addict" and did not

drink excessively nor bring bad people or other drugs home with him when he lived with them.  They tried

to get Ramiro into a drug rehabilitation program, as they felt the daily marijuana use was definitely causing

problems in his life, but the program was too costly and unattainable for them due their middle-wage

incomes.  Josh had started "vaping marijuana" and attempted suicide in his bedroom by strangulation.

Sara happened to enter the bedroom at the very moment Joshua tried to kill himself and she save him

from dying.  Joshua spent 10 days in in-patient therapy at Kaiser Hospital after his suicide attempt.  Sara

said Joshua greatly missed his father and would benefit from a healthy and sober Ramiro being back in his

life.  Joshua is now (or very soon to be) in their permanent legal custody, through SCCO Superior Court.

No further information was obtained.

Respectfully,

Daniel DeSantis

# EXHIBIT D

# Daniel DeSantis & Associates
### Investigative & Legal Services
### California License PI22551

Post Office Box 53469
San Jose, California 95153
(408) 226-4442 – ddesantis4442@aol.com

Client:  Ramiro Velasco, Jr.

Interview of Joshua Velasco (dob 10/1/2006); witness

<u>Saturday, April 15, 2023</u>

On the above date I, along with Defense Attorney Nicole Lambros, interviewed Joshua Velasco, the only child of Ramiro Velasco, Jr. by telephone.  The interview of this juvenile was authorized by Joshua's grandparents Sara and Ramiro Velasco, Sr., and approved the client.  Joshua was alone in his bedroom, where he lives with his grandparents, in San Jose, CA.  Joshua is currently in his junior year of high school at Andrew Hill High in San Jose.  He was cooperative in providing a statement.

Joshua's first memories as a child were of living with his father, Ramiro Velasco, Jr. (hereafter "Ramiro") and his mother, Cindy Cedillo, at the home of his paternal grandparents in Visalia, CA.  Ramiro said these memories go back to early childhood (he thought ages two or three) and he always had the comforting feeling that "life was good" for him.  He recalled his parents being loving toward him and his grandparents and there being no strife, arguing or violence in the home.  He said among his first memories are playing video games with his father and being given a new Nintendo WII video game.

Joshua said he only recalled his parents "being nice to each other" and said they did not fight or raise their voices toward each other, or anyone else, around him.  He never saw his father or mother raise

US vs. Ramiro Velasco, Jr.
Interview of Joshua Velasco
April 15, 2023
Page 2

a hand or become violent.  When he was around four years old he recalled his parents separated and Cindy moved in with a female friend in Visalia.  Joshua said his mother was "straight-laced" and did not speak English well.  She continued to see him and often had Joshua spend nights with her in her new temporary home.  Joshua said in his elementary school years this split-custody arrangement seemed to work well, however he liked to spend more time with his father than his mother ("60/40", when asked for an approximation). Joshua said: "They co-parented to the best of their abilities." Adding, "They kept me as innocent as possible."

Joshua always viewed his father as a quiet and respectful father.  All through his childhood he never saw his father drunk or high.  As he grew older, he came to realize that his father liked to smoke marijuana and would always "go outside in the backyard" to do so "with his friends."  Joshua said he never saw his father act erratic or high. Joshua was asked about Ramiro's friends and said "they were just normal people."  He said there was no "gang" element to them at all.  He cited that they were "Asian, white, Latino and black."  He never saw anyone showing gang colors, insignia or indicia.  His father did not speak of street gangs until Joshua was in his early teens.  Then, Ramiro only did so to warn Joshua "what to stay away from" and how to protect him from bad situations – what kind of clothing to wear, where to walk, which neighborhoods and people to be very wary of. Joshua said this sort of fatherly advice had served him well over the years.  Joshua said he never knew his father had a substance abuse problem or was involved in any criminal activities.  He knew Ramiro got arrested for possession of guns and also for driving under the influence.  He said during those absences when Ramiro was in custody were very hard on him. He loves and respects his grandparents, but said the comfortable way his father spoke to him and taught him about life was missing.

US vs. Ramiro Velasco, Jr.
Interview of Joshua Velasco
April 15, 2023
Page 3

Joshua said he always lived in suburban environments.  First in Visalia and then in San Jose with his grandparents and father.  His mother eventually found her way and has another family in Visalia.  He said Ramiro always took him places, did things with him and treated him with great love and care.  Joshua said things like gang colors or tattoos were not part of his childhood memories with respect to his father.  He never saw drugs or alcohol or guns in the home.  "My dad didn't expose me to any of that stuff." Joshua said he never noticed his father's manner change after he smoked marijuana.  Joshua thinks he was about 12-13 years old when he realized his father and father's friends were smoking marijuana in the backyard of their home.

In the 7th or 8th grade Joshua said he and Ramiro moved to San Jose and into the home of his grandparents, Sara & Ramiro, Sr.  They had always been a big part of his life and he was very comfortable living with them and his father.  They still encouraged him to keep in contact with his mother in Visalia.  There was no acrimony between his parents or grandparents.  The reason they moved to San Jose was a job opportunity for his father.  His grandfather was already successful in the Heating, Ventilation and Air Conditioning field, and his grandmother had a good job as well.

Joshua said Ramiro had a relationship with a woman named Angela who had three children of her own.  He and his father lived with Angela and her children.  He saw that his father was caring and loving toward Angela's three children.  He never saw Ramiro and Angela fight or argue much (more than Ramiro did with his mother, but not to the point of becoming irate with each other).  Joshua said Angela's two youngest children had severe behavior problems.  Joshua said he is relieved that the relationship between Ramiro and Angela ended.  He said his father calmly discussed the break-up with him.

When asked, Joshua said he feels if his father had not been by his side as a child "things would have been so different.  He taught me a lot – morals and values." Joshua said he is still learning good things

US vs. Ramiro Velasco, Jr.
Interview of Joshua Velasco
April 15, 2023
Page 4

from his father.  Joshua said he went through some difficult times of his own when he became a teenager.

He got in some trouble at school (he was attending a military academy type school in Visalia) and then he

became depressed.  He saw a therapist and has discussed with the therapist that he used the things he

learned from his father to help handle his mental issues and do better in school and life.  Joshua said he

speaks with his father by telephone and tries to visit him at Santa Rita (with his grandparents) each

Saturday, but dearly misses having Ramiro with him at home. He said, "My dad was always my emotional

support." Joshua said he never before spoke out about the sadness he felt when his father was gone (in

custody) and that he "just dealt with it internally."

Joshua said whenever his father was in custody he got "angry and confused" because he never

saw that side of Ramiro and felt he was losing the person he was closest to in life.  He knows his father is

embarrassed and regretful because of his current situation and has vowed to be a better father to Joshua.

Joshua said his own goals are to finish high school, get his driver license, go to a trade school in San Jose,

get a job in HVAC, or a similar trade, and get his own apartment by the time he is nineteen.  Joshua said

he would love to work with his grandfather and said Ramiro, Sr. "is the hardest working person I've ever

known." Joshua said when he is employed he plans to open a savings account and "put aside $100 to

$300" per month for his father so when Ramiro gets out of prison he will have money to get started finding

a car and a job again.  Joshua said he will have a room ready for his father if he doesn't stay with Sara and

Ramiro, Sr.  Joshua said: "He gave me everything I needed. Now I want to give back to him."

Respectfully,

Daniel DeSantis

CERTIFICATE OF SERVICE

I, Nicole E. Lambros, declare as follows:

I filed the above Sentencing Memorandum, together with Exhibits A through D via this Court's ECF system on May 4, 2023.

I declare under penalty of Perjury that the foregoing is true and correct.


Executed on May 4, 2023 at Redwood City, California.


Nicole Lambros, Declarant